UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 12-CR-57 (RHK/LIB) |
| v. | **REPORT & RECOMMENDATION** |
| KEVIN JOHN EHRICH, | |
| Defendant. | |

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the parties' Pretrial Motions. A Hearing was held on April 9, 2012, at which time the Defendant appeared personally, and by his attorney, Shannon R. Elkins, and the Government appeared by Clifford B. Wardlaw, Assistant United States Attorney.

**I.    BACKGROUND**

On September 10, 2010, FBI Agents Timothy Ball and Michael Iverson arrived at what Agent Timothy Ball recalled as the Defendant's girlfriend's mother's house in Grand Rapids, Minnesota to investigate the sexual assault of M.T. Both men wore civilian attire. Agent Ball recalled that he was armed and that his weapon was not visible. He also remembered that Agent Iverson was armed, but could not recall if his weapon was visible or not. After arriving, the agents were met at the door by the homeowner. The agents asked the homeowner if the Defendant was there and told her that they needed to talk to him. She told them that the Defendant was there and went and retrieved him. The Defendant came to the door and met the agents on the front porch. The agents identified themselves, stated who they worked for and the purpose of their visit, and showed the Defendant their FBI identification. They told the

Defendant that they were investigating a sexual assault and his involvement with M.T. The Defendant agreed to talk to the agents. The Agents and the Defendant moved to conduct their discussions in front of the home's garage near, but outside of, the agent's vehicle. The Defendant told the officers that he had not seen M.T. in awhile and that he had never partied with M.T. The discussions were conversational in tone. The Defendant's movement was not restricted and Agent Ball testified he made no physical contact with Defendant. The testifying agent, Timothy Ball, never told the Defendant prior to their discussions that he was under arrest. Agent Ball doesn't recall if he told Defendant he was free to leave. Agent Ball testified he thinks he told Defendant that he would not be arrested that day. After the conversation, the agents did leave and the Defendant went back into the residence. The entire encounter took about ten minutes.

Subsequently, on February 22, 2012, the Defendant was federally indicted for aggravated sexual abuse.

On February 28, 2012, FBI Agent Joe Ogden and Agent Bonser went to the Otter County Jail in Fergus Falls, Minnesota where Defendant was being held on unrelated state charges, where the agents arrested the Defendant pursuant to a federal arrest warrant.[1] Agent Ogden advised the Defendant that he was being arrested for sexual assault. The Defendant was placed in handcuffs and leg restraints. The Defendant asked Agent Ogden who had accused him of sexual assault. Agent Ogden simply replied M.T. The Defendant responded that he did not know her and had never touched her. Agent Ogden testified that he did not otherwise talk to the Defendant about the case following this exchange except to show the Defendant a copy of the federal indictment upon Defendant's request made during the subsequent drive from Fergus Falls to St. Paul.

---

[1] Before taking Defendant into custody, Agent Ogden and Defendant talked about Agent Ogden taking Defendant's personal property to Defendant's mother for him. Following Defendant's arrest, he was transported by the agents to Federal Court in St. Paul for his initial appearance on federal charges.

Presently before the court is the Defendant's Motion to Suppress Statements he made to law enforcement.

## II.    SEPTEMBER 10, 2010 STATEMENT

### A.    STANDARD OF REVIEW

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444).

However, "police officers are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him in custody." Id.

The Eighth Circuit analyzes six-factors when determining whether a suspect is in custody:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Sanchez, __F.3d__, 2012 WL 1207264, at *2 (8th Cir. Apr. 10, 2012) (citing United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)). "The analysis depends upon a

review of the totality of the circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview.'" Id. (citing United States v. Aldridge, 664 F.3d 705, 711 (8th Cir. 2011)).  Moreover, the determination is based on the totality of the circumstances, with none of the above factors being dispositive, and a particularly strong showing on one factor may compensate for a deficiency on another factor.  Griffin, 922 F.2d at 1347. The ultimate inquiry is whether there was a formal arrest or restraint on a defendant's movement of the degree associated with a formal arrest.  Stansbury v. California, 511 U.S. 318, 322 (1995).

### B. DISCUSSION

Defendant argues that the statements he made on September 10, 2010 should be suppressed because the agents did not give the Defendant a Miranda warning before questioning him in violation of his Fifth Amendment rights.

Based on the facts of the present case, the totality of the circumstances suggests that the Defendant was not in custody on September 10, 2010.  Therefore, the FBI Agents were not required to provide the Defendant with a Miranda warning.

Starting with the first factor in the analysis set forth in Griffin, whether the suspect was informed at the time that questioning was voluntary and whether he was free to leave, courts have noted that when "officers inform a suspect only that she is not under arrest"  but fails to inform the suspect that they are free to leave, "the first factor is less determinative in favor of noncustody, and our analysis relied more on the other indicia of custody." Sanchez, 2012 WL 1207264, at *2.   Here, Agent Ball testified that he did not recall whether he told the Defendant he was free to leave and thought that at some point he told Defendant that he was not going to be arrested that day.  Thus, this factor weighs slightly towards a finding that the Defendant was in

custody. Nevertheless, even when a suspect is not informed that they are free to leave nor specifically told they are not under arrest, he may still be considered not to be in custody. United States v. Flores-Sandoval, 474 F.3d 1142, 1147 (8th Cir. 2007)(finding that even though the defendant had not been informed he was free to leave, the totality of the circumstances established that his cooperation was voluntary and that he was not in custody); United States v. Mottl, 946 F.2d 1366, 1370 (8th Cir. 1991)(stating that although law enforcement did not tell the defendant that he was free to leave, nor that he was not under arrest, the defendant was not in custody because his freedom of movement was not restrained, he voluntarily agreed to participate, and no deceptive stratagems were employed); United States v. Axsom, 289 F.3d 496, 501 (8th Cir. 2002)(determining that the defendant was not in custody for Miranda purposes even though the FBI agents did not inform the defendant that he was not under arrest, that the questioning was voluntary, that he could refuse the interview request, or that he was free to leave because the totality of the circumstances indicated that the defendant was not in custody).

Turning to the second factor in Griffin, whether the suspect possessed unrestrained freedom of movement during questioning, this factor also tilts slightly in favor of noncustody. In this case, the Defendant was questioned outside of the FBI agents' vehicle near the front of the home's garage. Thus, the Defendant was not confined in an enclosed space. In addition, the Defendant was not placed in handcuffs nor physically restrained in any way.[2]

As to Griffin's third factor, whether the suspect initiated contact with the authorities or voluntarily agreed to official requests for questioning, this factor too favors a finding that the Defendant was not in custody. While the Defendant did not initiate contact with the FBI, he did

---

[2] However, since the Defendant did not try to leave, it is unclear what would have happened if the Defendant had attempted to leave. See United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006) (considering it impossible to determine restraint on freedom of movement where no physical restraints were present and the suspect did not attempt to leave the interview).

voluntarily agree to be questioned by the FBI about the sexual assault of M.T., and he did not at any time seek to terminate his conversation with law enforcement. Here, unlike in Sanchez, where the interview took place in a small closed room in a courthouse, the Defendant was outside at his girlfriend's mother's house; a setting which would have been much less police dominated than if the interview had taken place at law enforcement offices. Thus, the Defendant would reasonably have felt less pressure to answer law enforcement questioning. Compare with Sanchez, 2012 WL 1207264, at *2 (no custodial interrogation found although the third factor deemed to be inconclusive because the defendant agreed to questioning once she was in the interview room, and "such compliance would have been in response to a police-dominated environment").

The fourth factor, whether strong arm tactics or deceptive stratagems were employed during questioning, weighs strongly in favor of noncustody. No evidence was presented that the FBI agents used strong-arm tactics or deceptive stratagems while speaking to Defendant. The tone of the interview was conversational and lasted only ten minutes. No evidence was presented that law enforcement threatened or intimidated the Defendant or made any promises to get him to talk. United States v. Galceran, 301 F.3d 927, 930 (8th Cir. 2002) ("[A]lthough the officers had weapons, they 'did not adopt a threatening posture toward [the defendant], display their weapons, or make a physical show of force during the questioning.' ")

The fifth factor also weighs strongly in favor of noncustody. In the instant case, the atmosphere of the questioning was only slightly police dominated. While the police officers conducted the interview, the interview took place outside of the Defendant's girlfriend's mother's house which was an area where he should have been comfortable. See United States v. Chase,

2011 WL 4954650 , at *10 (D. Minn. Aug. 22, 2011)(finding that the atmosphere was not police dominated because the interview took place in his own apartment).

Lastly, the sixth <u>Griffin</u> factor, whether the suspect was placed under arrest weighs heavily in favor of noncustody.  The Defendant was not arrested on September 10, 2010.  In fact, Agent Ball testified that he thought he told the Defendant at some point that he would not be arrested that day. The Defendant was not arrested until February 28, 2012; a year and a half later. <u>See</u> <u>Galceran</u>, 301 F.3d at 931 (finding lack of arrest to be an important factor in favor of non-custody).

Upon the totality of the circumstances, the Court finds that the Defendant was not in custody when he talked to law enforcement on September 10, 2010.  Here, although the Defendant was not informed that he was free to leave, and he was not placed under arrest, he was not questioned in a police dominated environment, the contact with police lasted only ten minutes, no deceptive strategies or force were used by the police, and the Defendant had agreed to talk to the agents.  A reasonable person in Defendant's position would not "have felt he or she was not at liberty to terminate the interrogation and leave." <u>Thompson v. Keohane</u>, 516 U.S. 99, 112 (1995).  Moreover, the Defendant's freedom was not restrained to a degree associated with formal arrest requiring a <u>Miranda</u> warning.

Consequently, the Court recommends that the Defendant's motion to suppress the September 10, 2010 statement be denied.

### III.   FEBRUARY 28, 2012 STATEMENT

#### A.   STANDARD OF REVIEW

The Sixth Amendment right to counsel is triggered "at or after the time that judicial proceedings have been initiated ... 'whether by way of formal charge, preliminary hearing,

indictment, information, or arraignment.'" Brewer v. Williams, 430 U.S. 387, 398 (1977).  An accused's Sixth Amendment rights are violated "when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." Massiah v. United States, 377 U.S. 201, 206 (1964).  The Sixth amendment "deliberate elicitation" standard is different from the custodial interrogation standard in Miranda.  Fellers v. United States, 540 U.S. 519, 524 (2004).  "Deliberate elicitation under the Sixth Amendment 'covers only those statements obtained as a result of an intentional effort' on the part of government officials to secure incriminating statements from the accused" United States v. Rommy, 506 F.3d 108, 135 (2nd Cir. 2007)(quoting United States v. Stevens, 83 F.3d 60, 64 (2nd Cir. 1996)).

    **B.**    **DISCUSSION**

Turning to the facts of this case, the Defendant was indicted on February 22, 2012.  The statements the Defendant seeks to suppress were made on February 28, 2012.  The Defendant argues that these statements were therefore obtained in violation of his Sixth Amendment rights.

However, because there is no indication that Agent Ogden "deliberately elicited" information from the Plaintiff in order to obtain information from the Defendant regarding the facts underlying the charge, the statements did not violate the Sixth Amendment.

Here, the Defendant initiated the conversation with Agent Ogden.  Agent Ogden told the Defendant that he was being arrested upon a federal warrant for sexual assault.  The Defendant then unilaterally asked Agent Ogden who had accused him of sexual assault.  Agent Ogden simply replied M.T.  The Defendant voluntarily and without any inquiry by Agent Ogden then stated that he did not know her and had never touched her.  Thus, the statements made by the Defendant were spontaneous and not in any way compelled or deliberately elicited by conduct of

Agent Ogden.  See United States v. Williams, 2007 WL 3037349, at *4 (D. Minn. Oct. 16, 2007)(finding that simply answering a question put forth by the defendant did not constitute "deliberate elicitation").  In fact, on the record before the Court, Agent Ogden did not ever ask the Defendant a question.  Instead, the Defendant volunteered the statement that he did not know and had never touched M.T.  Compare with United States v. McManaman, 2008 WL 2397675, (N.D. Iowa Jun. 9, 2008)(finding that police specifically asking whether there was anything illegal in the house upon defendant's arrest violated the defendant's Sixth Amendment rights).

The Defendant contends that this case is similar to Fellers v. United States, 540 U.S. 519 (2004). There, after the defendant was indicted, officers arrived at his home to arrest him.  During the process, they informed the defendant that they had come to discuss his involvement in methamphetamine distribution.  Fellers, 540 U.S. at 521.   While at the defendant's home, the officers then

> informed petitioner that they had a federal warrant for his arrest and that a grand jury had indicted him for conspiracy to distribute methamphetamine. The officers told petitioner that the indictment referred to his involvement with certain individuals, four of whom they named. Petitioner then told the officers that he knew the four people and had used methamphetamine during his association with them.

Id.  The entire encounter in Fellers took about 15 minutes.  Id.

The instant case, however, can be distinguished from Fellers.  There, the officers arrived at the defendant's home and, rather than arresting him immediately, they spent 15 minutes at the Defendant's home asking him questions.  When they first arrived at the defendant's home, the officers told him that they came to talk about his involvement in methamphetamine.  Thus, there was evidence in Fellers that the officers specifically set out to obtain information from the Defendant about his involvement with the crime.  In this case, no evidence has been presented showing that the officers were intentionally seeking information about the sexual assault when

9

they arrived at the Otter Tail County Jail to arrest the Defendant and informed him of the charges against him. They did not travel to the Defendant's home or begin their contact with the Defendant by telling him that they were going to talk about the case. Instead, the officers came to the jail and simply informed the Defendant that they were there to arrest him. Merely informing the Defendant of the reason for his arrest does not demonstrate an attempt at "deliberate elicitation" of incriminating information. Moreover, Agent Ogden's simple statement that M.T. had accused Defendant of the crime for which he was being arrested was merely an answer to the Defendant's own voluntary question. Instead, the evidence in the record before this Court points to the fact that the purpose of the agents' contact with the Defendant on February 28, 2012, was solely and simply to arrest him on pending federal charges.

Thus, the Court recommends that that the Defendant's motion to suppress the February 28, 2012 statement be denied.

## IV.   CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein,

**IT IS HEREBY RECOMMENDED**

1. That Defendant's Motion to Suppress Statements, Admissions and Answers [Docket No. 16] be **DENIED**.

Dated:  April 25, 2012
s/Leo I. Brisbois
LEO I. BRISBOIS
United States Magistrate Judge

**N O T I C E**

Pursuant to Local Rule 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties **by May 9, 2012**, a writing that

specifically identifies the portions of the Report to which objections are made and the bases for each objection. A party may respond to the objections within fourteen days of service thereof. Written submissions by any party shall comply with the applicable word limitations provided for in the Local Rules. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. This Report and Recommendation does not constitute an order or judgment from the District Court, and it is therefore not directly appealable to the Court of Appeals.